UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-21226-CIV-ALTMAN

SYLVIA BREAUX,

     *Plaintiff,*

*v.*

NCL (BAHAMAS) LTD.,

     *Defendant.*

_____/

## ORDER

In this cruise-ship medical negligence case, the parties spend most of their time arguing about the standard of care that should apply to doctors at sea. But, as we'll soon see, this case turns on something not so nautical: causation. Our Plaintiff, Sylvia Breaux, fell at a restaurant in Cozumel after docking in Mexico on a cruise-ship operated by our Defendant, NCL (Bahamas) Ltd. ("Norwegian"). In pain and concerned, she rushed back to the cruise for medical treatment, where the ship's physician—Dr. Lee—diagnosed her with a mild sprain. Unfortunately, when she returned home a few days later, Mrs. Breaux's doctors determined that, in fact, she had dislocated her elbow and fractured her arm in several places.

Given this incongruity between Dr. Lee's diagnosis and Mrs. Breaux's painful reality, Mrs. Breaux sued Norwegian,[1] alleging *both* that Dr. Lee had engaged in medical malpractice *and* that

---

[1] Initially, Mr. Stephan Breaux, Sr.—Mrs. Breaux's husband—was also a plaintiff in this lawsuit, *see* Complaint [ECF No. 1] at 7–8 (Mr. Breaux's loss-of-consortium claim), and Dr. Lee was the second defendant, *see id.* at 8–9 (the negligence claim against Dr. Lee). Since then, however, both Mr. Breaux and Dr. Lee have been dropped as parties to this case, leaving Mrs. Breaux as the sole plaintiff and Norwegian as the only defendant. *See generally* Docket; *see also* Order Granting Motion to Dismiss the Loss of Consortium Claim [ECF No. 30]; Order Granting Motion to Dismiss Defendant Dr. Lee for Lack of Personal Jurisdiction [ECF No. 55].

Norwegian was negligent in hiring, retaining, and training its onboard doctor. *See generally* Complaint [ECF No. 1]. After some protracted litigation, Norwegian moved for summary judgment. *See* MSJ [ECF No. 94].[2] Because Mrs. Breaux has failed to show that Dr. Lee's negligence—or, for that matter, Norwegian's—caused her injuries, we now **GRANT** the MSJ.

## THE FACTS[3]

Our Plaintiff, Sylvia Breaux, and her husband, Stephan Breaux, enjoy traveling on cruises, and they do so often. In March of 2019, they—along with Mrs. Breaux's cousin, Rosanne Williams, and *her* husband—took a trip on Norwegian's *Breakaway*. While the *Breakaway* was docked in Cozumel, Mexico, Mrs. Breaux and her companions left the ship to sightsee and to shop. As she'd done on several trips before,[4] Mrs. Breaux went to a Señor Frog's[5] restaurant for a smoke break before returning to the ship. In the crowded Señor Frog's, Mrs. Breaux "misstepped" on her way to the patio and "went down." Sylvia Breaux Deposition Transcript ("Breaux Dep. Tr.") at 94:4–8. "[W]hen [she] slipped down, [she] hit [her] head on a chair, [her] arm on [a] ledge, [and her] hip on the ledge[.]" *Id.* at 94:17–19; *see also* Joint Statement of Undisputed Facts ("Joint SOF") [ECF No. 96] ¶ 2 ("Mrs.

---

[2] The Motion is ripe for resolution. *See* Response [ECF No. 108]; Reply [ECF No. 109].

[3] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)).

[4] *See* Sylvia Breaux Deposition Transcript ("Breaux Dep. Tr.") at 94:9–13 ("Q. Had you been to this particular Se[ñ]or Frog's before? A. Oh, yes. Q. Had you used that smoking patio before? A. Every time.").

[5] The Señor Frog's isn't affiliated with Norwegian. *See* Joint Statement of Undisputed Facts ("Joint SOF") [ECF No. 96] ¶ 2 (referring to "a local Se[ñ]or Frog's restaurant/bar that was not affiliated with NCL").

Breaux left the ship and fell and injured her left arm in a local Se[ñ]or Frog's[.] Mrs. Breaux also hit her head but was able to get up with assistance[.]" (citing Breaux Dep. Tr. at 92:23–25, 93:24–94:25, 96:5–11)). Although she "knew something was wrong[,]" she insisted on getting up on her own and then sat in a chair. Breaux Dep. Tr. at 105:20, 106:11–21. According to Mrs. Breaux, her "whole arm and [her] hand w[ere] black[,]" *id.* at 103:22–23, and she felt "[e]xcruciating" and "[s]harp" pain throughout her "whole arm [and] hand," *id.* at 105:14–25. She "was in so much pain" that she was "holding [her arm] so it wouldn't move." *Id.* at 108:4–5. Her companions "wanted to call [an] ambulance," but she refused because "the ship was going to be leaving in a couple of hours and [she] didn't want to get stranded in Mexico." *Id.* at 95:10–13. She had also purchased the insurance for the ship and knew that she could go to its medical center. *Id.* at 95:14–16.

Mrs. Breaux and Mrs. Williams rode back to the dock and told a crewmember that they needed to visit the *Breakaway*'s medical center. *Id.* at 95:17–24. "Mrs. Breaux was immediately escorted to the medical center, and Mrs. Williams stayed with her." Joint SOF ¶ 3. Although the on-board medical center's hours are limited, medical staff is available for emergencies even when the center is closed. *Id.* ¶ 4 ("The on-board medical center is referred to as a clinic, and its posted hours are limited. The attending physician Maria Guerlain Lee, testified that although the clinic has limited hours . . . , medical staff is available for emergencies when the clinic is closed." (citation omitted)). Mrs. Breaux arrived at the clinic during these "after hours." *Id.* ¶¶ 4–5. Mrs. Williams helped Mrs. Breaux fill out the intake form and, without consulting directly with Mrs. Breaux, submitted Mrs. Breaux's medical information to the clinic staff. *See* Breaux Dep. Tr. at 117:6–25.

Mrs. Breaux was treated by Nurse Ralph Onofre and Dr. Maria Guerlain Panganibai Lee. *See* Joint SOF ¶ 8; *see also* Norwegian Employee Badge [ECF No. 87-2] (noting Dr. Lee's full name and nationality). Nurse Onofre—who was the first one to see Mrs. Breaux, *see* Dr. Maria Lee Deposition Transcript ("Lee Dep. Tr.") [ECF No. 87-1] at 63:7–9 (discussing Nurse Onofre's role in Mrs.

Breaux's care)—took her vitals, *see* Joint SOF ¶ 8. Dr. Lee is a board-certified physician in emergency medicine in her home country of the Philippines. *See id.* ¶ 5; *see also* Lee Dep. Tr. at 124:13–17 ("Q. And you say you're double board certified? A. Yes. Q. What does that mean? A. I have passed the boards for medicine, and then I have also passed the boards for emergency medicine."). Dr. Lee also has specialized training in the areas of Advanced Cardiovascular Life Support, Advanced Trauma Life Support, and Pediatric Advanced Life Support. *See* Lee Dep. Tr. at 117:24–120:13 (discussing the requirements for these certifications). Dr. Lee is neither a radiologist nor an orthopedist. *See* Joint SOF ¶ 5.

Mms. Breaux and Williams told Dr. Lee about the slip-and-fall at Señor Frog's. *See* Norwegian Intake Form [ECF No. 87-3] (listing reason for consultation as "Fall @ Senor Frogs [sic]" and signed by "Rosanne Williams for Sylvia Breaux"). According to Mrs. Breaux, she couldn't move her arm while she was at the medical center. *See* Breaux Dep. Tr. at 137:25–138:6; *see also* Lee Dep. Tr. at 84:14–15, 20–22 ("I can't recall, but based on this [record] she just did not move her left shoulder. . . . [Doctors] do not force anyone to move anything that may be painful before [they] can actually do an x-ray."). Based on her examination, Dr. Lee ordered three x-rays of Mrs. Breaux's left elbow. *See* Plaintiff's Statement of Facts ("Pl.'s SOF") [ECF No. 102] ¶ 9; Lee Dep. Tr. at 87:7–88:4 (discussing these x-rays); Norwegian Case Summary [ECF No. 85-4] at 4 (noting that x-rays of three views of the elbow were taken).[6] After reviewing the x-rays, Dr. Lee determined, "[b]ased on the record[,] [that] there was no demonstrable fracture." Lee Dep. Tr. at 88:6–7. In her deposition, Dr. Lee admitted that there was some "shadow" visible in one of the x-rays. *Id.* at 29:16–17 ("I can see a shadow at the head of the the—of the ulna near the head, the olecranon."). And she noted that such a shadow would typically prompt her to examine the patient more closely. *Id.* at 39:8–15 ("[Q]. What does this shadow

---

[6] *See also* Lee Dep. Tr. at 82:16–87:19 (discussing the examination and the x-ray order).

represent, once more? A. . . . [I]t's a sign for me to see the patient again. . . . See the patient, to interview, as well as to get the physical examination of that patient. . . . [t]he clinical picture."); *see also id.* at 41:20–25 ("Q. Is it your testimony . . . that solely from [the x-ray with the shadow] you cannot ascertain whether there's a dislocation? . . . A. I see the shadow. I have to investigate. By investigation you have to correlate what you see on the x-ray with the clinical findings."). According to Dr. Lee's notes, Mrs. Breaux was "unable to move her left shoulder [or her left elbow] due to pain on her left forearm," but she was "able to move and feel all fingers" and to "make a fist[.]" Norwegian Case Summary at 4. She was also "ambulatory without assistance[.]" *Id.* Mrs. Breaux received a shot to alleviate her pain, and Dr. Lee applied a SAM splint and elastic bandage. *See* Joint SOF ¶¶ 11–12; Norwegian Case Summary at 1 (noting that "Ketorolac 60mg IM [was] given as ordered" and that a "[l]ong arm splint [was] done by Dr. Lee").

Dr. Lee diagnosed Mrs. Breaux as having "[p]ain in [her] left forearm[.]" Norwegian Case Summary at 6. Dr. Lee's records also reveal three differential[7] diagnoses: a "sprain of the carpal joint of the left wrist"; a "strain of unspecified muscles, fascia, tendons at the forearm"; or some "other sprain of the left elbow." Lee Dep. Tr. at 93:25–94:4; *see also* Norwegian Case Summary at 6–7. Dr. Lee instructed Mrs. Breaux to keep her arm immobilized, to monitor her head injury, to avoid alcoholic beverages, to leave her arm in the splint, and to follow up with an orthopedist when she got home. *See* Norwegian Case Summary at 7. Mrs. Breaux was "discharged comfortable and ambulatory[.]" *Id.* According to the Case Summary—which Mrs. Breaux signed, *see id.* at 8—a "follow up [sic] [was] required." *Id.* at 7.

---

[7] "A differential diagnosis is a list of possible conditions that share the same symptoms that [a patient] describe[s] to [their] healthcare provider. Th[e] list is not [the patient's] final diagnosis, but a theory as to what is potentially causing [the patient's] symptoms." Differential Diagnosis, CLEVELAND CLINIC, available at https://my.clevelandclinic.org/health/diagnostics/22327-differential-diagnosis (last visited on June 17, 2022).

During her deposition, Mrs. Breaux (unsurprisingly) testified that she wasn't satisfied with the medical treatment she received on the *Breakaway*. *See* Breaux Dep. Tr. at 211:7–11 ("Q. Okay. Do you believe that Norwegian, its doctors, and the medical staff that treated you on the day of your fall provided you with adequate medical care? A. No."). When Mrs. Breaux was asked about the experience, she noted that she had "never had a broken bone before" and that she "never had a sprain before," so she "never knew what pain [she] was going to be feeling or how it was supposed to feel, so [she] just took it for granted that's what it was." *Id.* at 133:3–7. In other words, she trusted Dr. Lee's opinion that she just had a sprain. *See id.* at 153:5–7 ("I assumed that what [Dr. Lee] said was wrong with me was the letter of the law. I had two bad sprains."); *see also id.* at 172:15–16 ("I didn't know what a sprain felt like. I said, [t]hat's what I assumed it was."). All that said, she agreed that she'd been treated well in the medical center and by Norwegian's staff generally. *See id.* at 151:23–152:16 ("Q. Okay. But did you have any complaints about like how she interacted with you or generally what her demeanor was with you that day or how she treated you? A. Well, you know, she was—I've been on Norwegian many times and Norwegian's always been straight up. . . . Q. . . . My question was more about was she rude to you or did she treat you in a way that you felt like she was hostile and rude? A. No, no. Q. Was she professional? A. I assumed she was.").

Despite her injury, Mrs. Breaux tried to make the best of her vacation. *See id.* at 154:5–8 ("I didn't want to ruin everybody else's cruise by being a pain in the butt and staying in the room and doing nothing. So I attempted to enjoy the rest of the cruise for what it was."). But she was in extreme pain and spent most of her remaining time on the cruise in her cabin or on deck. *See id.* at 155:5–8 ("Q. Okay. What did you do during the remainder of the cruise? A. Basically stayed in my room or went up on deck."). She never returned to the medical center. *See* Joint SOF ¶ 13. And she wasn't interested in visiting a different doctor in the other ports the *Breakaway* may have visited after her fall. *See* Breaux Dep. Tr. at 147:10–20 ("Q. Let me ask you it this way: If someone in the medical center

had offered that to you, said, Hey, the next port is, whatever the next port is, would you like to get off the ship and go to a shoreside hospital in that port in Mexico or Belize or wherever the ship was, would you have done that? A. No. Q. Your plan after seeing the doctor was just to follow her advice of going to go see your own doctor once you got back home; correct? A. Exactly."). Mrs. Breaux did, however, suggest that, had she known her injury was more serious, she would've considered visiting a hospital while the ship was docked—though *not* in Mexico because she doesn't trust the doctors there. *See id.* at 210:7–17 ("Q. Irregardless [sic] of the objection, do you understand what I'm asking? A. Would I have left the ship if I knew it was broke? Q. That's correct. A. And out of joint? Q. That's correct. A. To get it fixed? As long as it wasn't in Mexico, I would have. I don't trust them doctors. I'm sorry. I'm telling you."). In an omission that will become important to our overall story, neither party adduced any evidence of the ship docking at *any* port—other than Mexico—after the fall.

On the Monday after the *Breakaway* returned to New Orleans, Mrs. Breaux saw her primary care physician, Dr. Christopher Richards, who advised her to see a specialist. *See* Joint SOF ¶ 14. Dr. Richards noted in his records that Mrs. Breaux complained of an "[i]njury of [her] left forearm and wrist[.]" Primary Care Physician's Records [ECF No. 90-1] at 6. He was also concerned that the "splint [was] not most appropriately fitted" for a "possible fracture." *Id.* So, later that day, Mrs. Breaux visited the Bone & Joint Clinic—an orthopedic center in Marrero, Louisiana[8]—where she saw Dr. Robert Shackleton. *See* Bone & Joint Clinic Sign-In Sheet [ECF No. 88-4]; *see also* Dr. Gustavo Godoy Deposition Transcript ("Godoy Dep. Tr.") [ECF No. 88-1] at 14:1–20 (discussing Mrs. Breaux's initial visit to the clinic). Dr. Shackleton took images and concluded that Mrs. Breaux's elbow was dislocated. *See* Joint SOF ¶ 15. Because Dr. Shackleton determined that the dislocation needed to be treated

---

[8] *See* Bone & Joint Clinic Sign-In Sheet [ECF No. 88-4].

immediately, he sent Mrs. Breaux to a near-by hospital to be seen by Dr. Gustavo Godoy—Dr. Shackleton's partner at the Bone & Joint Clinic. *See id.* ¶¶ 15–16.

Dr. Godoy is an orthopedic surgeon, "fellowship-trained in adult reconstruction surgery[,]" "trained in pediatrics[,]" and "trained in trauma[.]" Dr. Godoy CV [ECF No. 88-2] at 1. In addition to working at the Bone & Joint Clinic, he's also a clinical instructor at the Department of Orthopedic Surgery at Tulane University School of Medicine. *Id.* Dr. Godoy became Mrs. Breaux's treating physician. *See generally* Bone & Joint Clinic Medical Records [ECF Nos. 88-2–88-7] (medical records showing Mrs. Breaux's appointments with Dr. Godoy). At the hospital, Dr. Godoy placed Mrs. Breaux's elbow back into its socket—conducting what's called a "closed reduction."[9] Joint SOF ¶ 16; *see also* Bone & Joint Clinic Records for April 2, 2019 [ECF No. 88-4] at 2 ("Her left dislocation was reduced in the emergency room yesterday and splinted."). Dr. Godoy knew her elbow was dislocated based on the x-rays. *See* Godoy Dep. Tr. at 29:13–15 ("Q. . . .[H]ow'd you come to learn her elbow was dislocated? A. Cause I saw her x-rays."). He did note, however, that he used a CT scan to "confirm" the dislocation and that CT scans are useful for "preoperative planning and to better understand the extent of [the] injury and again, . . . to confirm her reduction[.]" *Id.* at 32:17–20. Dr. Godoy testified that Mrs. Breaux had what's known as a "terrible triad injury"[10]—a left radial head fracture, an elbow dislocation, and a coronoid fracture. Joint SOF ¶ 17. The day after her closed reduction, Mrs. Breaux returned to the Bone & Joint Clinic, where Dr. Godoy treated her and developed a surgical plan to address her two fractures. *See* Bone & Joint Clinic Records for April 2,

---

[9] *See* Godoy Dep. Tr. at 24:10–17 ("Q. . . . And what do you mean by closed reduction? A. So reduction is the term used for taking something that is dislocated and putting it back in its anatomical location and closed meaning that it's done without making an incision [be]cause if you made an incision then it would be open by definition.").

[10] He clarified that, in this context, "terrible" is a "term of art that describes the constellation of [Mrs. Breaux's] injuries"; it isn't a judgment about the severity of those injuries. Godoy Dep. Tr. at 34:8–9; *see also id.* at 34:17–18 ("[I]t's not my value judgment on the severity or terribleness of her injury.").

2019 at 2. Dr. Godoy determined that Mrs. Breaux's injuries occurred at the time of the fall—and *not* in the interregnum between her fall and the surgery. *See* Joint SOF ¶ 18. Dr. Godoy ultimately operated on Mrs. Breaux's arm.

Over the next few months, Mrs. Breaux continued to seek treatment from the Bone & Joint Clinic—usually from Dr. Godoy, but sometimes from the Clinic's pain-management team. *See* Godoy Dep. Tr. at 78:5–79:7 (the clinic's patient notes for Mrs. Breaux). It appears that at least some of these visits may have been *unrelated* to the fall. *See* Pain Management Team New Patient Form [ECF No. 88-8] at 1 (noting pain in Mrs. Breaux's neck, knees, and lower back—in addition to her left elbow); *see also* Godoy Dep. Tr. at 99:4–13 (explaining that Mrs. Breaux was "being treated for chronic pain syndrome, lumber degenerative disc disease, knee arthritis, just to name some of the diagnos[e]s she's being treated for").

In his deposition, Dr. Godoy testified that the surgeries to correct Mrs. Breaux's fractures had been successful—a "proverbial home run." Godoy Dep. Tr. at 88:18–25 ("Q. [I]n terms of the surgical success rate, this is a very good outcome that you had for your particular patient? A. Absolutely. I had—if I had somebody with an identical injury and I knew that that many months post-op that they would have these outcomes that would be the proverbial home run, so to speak."). He also agreed that Mrs. Breaux now has all but five degrees of flexation in her left elbow. *See* Joint SOF ¶ 19; Godoy Dep. Tr. at 88:1–5 ("Q. She has all but five degrees of flexation on her left elbow; is that right? . . . A. Yeah, so it seems that—that she has full flexion and that she lacks five degrees of terminal extension."). When asked whether five degrees was a "relatively minor limitation," Dr. Godoy said: "you'd have to ask [Mrs. Breaux] how she feels about that one[.]" *Id.* at 88:8–12. Mrs. Breaux testified that "she can no longer cook, do yard work or do push-ups with her grandkid[s]"—activities she used to enjoy— because of her injuries. Pl.'s SOF ¶ 35 (citing **Breaux Dep. Tr.** at 196:14–25, 11:23–12:4, 72:23–73:7, 197:23–198:2).

One more thing: Dr. Godoy didn't think that the delay in treatment—between Dr. Lee's diagnosis and Dr. Richards's—had *any* impact on Mrs. Breaux's outcomes, and he didn't believe that, without the delay, Mrs. Breaux's recovery would have been any different. *See* Godoy Dep. Tr. at 95:9–96:1 ("[Q.] You cannot testify with any degree of certainty that any delay in treatment to Mrs. Breaux would have changed the outcome she ultimately had; is that right? A. Good question. I mean, I would say that, like, delay in treatment in general is associated with poor outcomes, but I cannot—I—I can't say that—I mean, like you mentioned I think she had an excellent outcome from her injury regardless of that delay, you know. Q. You—you can't say that any—that four days would have made a difference whatsoever with regard to this patient, am I correct, sir? A. I—I cannot, no. I've had patients that have had this injury that was treated immediately and they're doing worse and I still think that that's a good outcome."). And, on this crucial question—*i.e.*, whether Dr. Lee's misdiagnosis caused Mrs. Breaux any damages at all—Mrs. Breaux produced *no* other evidence.

## THE LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the records, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a

reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for the trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted); *see also* FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). The Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." *Obremski v. Armor Corr. Health Servs., Inc.*, 467 F. Supp. 3d 1265, 1275 (S.D. Fla. Apr. 7, 2020) (Altman, J.) (citing *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)).

"[I]f there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. Aug. 17, 2021) (Altman, J.). The Court, on the other hand, must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of [its] case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (cleaned up)).

ANALYSIS

## I. Medical Negligence

Claims arising from torts committed aboard ships on navigable waters are governed by general maritime law. *See Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir. 1989) ("[W]e note that the substantive law applicable to this action, which involves an alleged tort committed aboard a ship sailing in navigable waters, is the general maritime law[.]"). "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care toward those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnia Generale Transatlantique*, 358 U.S. 625, 630 (1959). At the same time, a shipowner "is not liable to passengers as an insurer, but only for its negligence." *Keefe*, 867 F.2d at 1322.

Mrs. Breaux's claims against Norwegian arise out of Dr. Lee's alleged medical negligence in treating her injuries. *See generally* Complaint. And cruise ships may be liable for the negligence of their medical staff. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1248 (11th Cir. 2014) ("Thus, we hold that Franza's allegations established a plausible agency relationship between the employer, Royal Caribbean Cruise Lines, Ltd., and its employees, Nurse Garcia and Dr. Gonzales, and that the district court improvidently granted the Rule 12(b)(6) motion to dismiss."). For Mrs. Breaux to succeed on this claim, though, she must establish that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and

12

proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (per curiam).

Norwegian asks for summary judgment on the second and third of these elements. *See* MSJ at 3–10 (arguing that Dr. Lee didn't breach the standard of care because the standard that applies at sea—where medical supplies are limited—is different than on land), 10–15 (contending that Mrs. Breaux failed to show a causal connection between Dr. Lee's misdiagnosis and her injuries). Because we agree that Mrs. Breaux has failed to create a genuine issue of material fact on the element of causation, we decline to consider the parties' primary dispute on the extent to which Dr. Lee may have breached the applicable standard of care. *Cf. Celotex*, 477 U.S. at 317 (explaining that the plaintiff's "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"); *Maag v. Silversea Cruises, Ltd.*, 2019 WL 1724044, at *3 (S.D. Fla. Apr. 18, 2019) (Torres, Mag. J.) ("The parties dispute whether there is any evidence in the record that [the] Defendants served [the] Plaintiff shellfish while aboard the [cruise]. We need not resolve this factual dispute, however, because [the] Plaintiff's negligence claim fails for a conspicuous reason— lack of causation."), *report and recommendation adopted*, 2019 WL 2255017 (Williams, J.).

As we've said, to survive summary judgment, the non-movant must produce "sufficient evidence supporting the claimed factual dispute [ ] to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248. "Each element, including causation, is essential to [a] [p]laintiff's negligence claim." *Kellner v. NCL (Bahamas), Ltd.*, 2016 WL 4440110, at *1 (S.D. Fla. Aug. 22, 2016) (Altonaga, J.); *see also Valentine v. United States*, 630 F. Supp. 1126, 1132 (S.D. Fla. 1986) (Spellman, J.) ("The burden of proof in admiralty cases is on the Plaintiff to show that the Defendant was negligent and that such negligence was the proximate cause of the plaintiff's damages. . . . A finding of proximate cause may not be based on speculation or conjecture." (cleaned

up)); *cf. Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla. Mar. 28, 2022) (Altman, J.)
("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]").

      "Plaintiffs are required to introduce expert testimony to establish medical causation." *Marking*
*v. Novartis Pharm. Corp., Inc.*, 2002 WL 32255405, at *3 (S.D. Fla. Feb. 12, 2002) (Ryskamp, J.); *see also*
*Phillips v. Delta Air Lines*, 2021 WL 5584193, at *2 (S.D. Fla. Nov. 30, 2021) (Middlebrooks, J.)
("Summary judgment is warranted because [the] Plaintiff lacks expert medical testimony, which is
required to meet her burden on the element of causation due to the nature of her claim[.]"); *Morhardt*
*v. Carnival Corp.*, 304 F. Supp. 3d 1290, 1298 (S.D. Fla. Dec. 4, 2017) (Graham, J.) ("[The plaintiff's]
failure to timely disclose a medical expert who can provide medical causation testimony to establish
proximate cause is fatal to his claim. . . . Expert testimony is required to establish causation for
conditions not readily observable or susceptible to evaluation by lay persons."); *Rivera v. Royal Caribbean*
*Cruises, Ltd.*, 2016 WL 7176644, at *3 (S.D. Fla. Dec. 8, 2016) (Seitz, J.) ("Establishing medical
causation requires the testimony of an expert."); *Drury v. Cardiac Pacemakers, Inc.*, 2003 WL 23319650,
at *3 (M.D. Fla. June 3, 2003) (Kovachevich, J.) ("In a negligence case, in order to establish causation,
expert testimony is necessary."); *Scott v. United States*, 127 F. Supp. 422, 424 (N.D. Fla. 1955) (De Vane,
C.J.) ("[I]t has been consistently held that whether there was a causal connection between an accident
. . . [and a sustained injury] . . . is a question with respect to which only medical experts with training,
skill, and experience could . . . express an intelligent opinion.").

      Mrs. Breaux has adduced *no* evidence—much less qualified expert testimony—for her view
that Dr. Lee's negligence caused her injuries. Mrs. Breaux (it's true) testified that her injuries have
negatively impacted her life. *See* Breaux Dep. Tr. at 197:3–21 (explaining that she "do[es]n't cook
anymore because [she] can't lift pots," and that she "can't do yard work no [sic] more"), 12:1–4 ("I
didn't have any health issues. I could do pushups. I can't do pushups no [sic] more."), 72:23–73:7
(testifying that, before the cruise, she would do pushups with her grandkids), 197:24–198:25 ("Q. . . .

Have you done any push-ups since the incident? A. No, girl. That's sad. . . . Q. Have you played pool at all since the incident? A. Nope. Q. Do you still go on walks down the river? A. Nope. I couldn't bend over to get that. If I find it, I have to bring it to somebody's attention to fetch. . . . Q. But my next question was: Has the incident affected your relationship with your husband? A. Oh, evidently it has, since he brought it to my attention."). But she never tied these injuries to *Dr. Lee*'s negligence. Instead, her testimony—fairly read—stands only for the uncontroversial proposition that *the fall* caused her injuries. The fall, though, isn't at issue here. No one denies that the fall caused Mrs. Breaux's injuries. The question, rather, is whether *Dr. Lee's misdiagnosis* contributed to those injuries. And, on this point, Mrs. Breaux gives us next to nothing. Nor could she have done otherwise. As we've explained, Mrs. Breaux isn't a medical doctor, and so she probably isn't competent to opine on the extent to which the four-day delay in treatment—from Dr. Lee's misdiagnosis to her visit with Dr. Richards—resulted in any damage.[11]

Indeed, the evidence from her own doctors suggests that this several-day delay caused her *no* injury at all. So, for instance, Dr. Godoy—Mrs. Breaux's treating physician—was very happy with Mrs. Breaux's recovery and characterized her outcome as exceptional. *See* Godoy Dep. Tr. at 87:16–23. In fact, in Dr. Godoy's opinion, Mrs. Breaux has done *even better* than similarly situated patients who *were* properly diagnosed and who *were* treated without delay:

> Q. [I]t looks like generally [Mrs. Breaux is] doing very well post-surgery; is that correct?
> A. Yes, given—I mean, given her—given her injury, these injuries are associated with very bad outcomes, so the—the—the standard kind of changes some, but I would say coupling an injury that I consider rather severe I think yeah, she's doing well.
> . . . .
> Q. [I]n terms of the surgical success rate, this is a very good outcome that you had for your particular patient?

---

[11] Mrs. Breaux was injured on a Tuesday, and she saw Dr. Richards the following Monday. When we say four days, then, we mean the four workdays she spent on the *Breakaway* between Tuesday and Friday.

A. Absolutely. I had—if I had somebody with an identical injury and I knew that many months post-op that they would have these outcomes that would be the proverbial home run, so to speak.

Q. . . . [Y]ou had a very good outcome for your particular patient, right, sir?

A. For this injury, yes.

. . . .

Q. And the type of injury that she ultimately had is something that you've seen that is consistent with somebody that had a fall like Mrs. Breaux did or did at the time; is that right?

A. Yes.

Q. . . . You cannot testify with any degree of certainty that any delay in treatment to Mrs. Breaux would have changed the outcome she ultimately had; is that right?

A. Good question. I mean, I would say that, like delay in treatment *in general* is associated with poor outcomes, but I cannot—I can't say that—I mean, like you mentioned I think she had an excellent outcome from her injury *regardless of delay*, you know.

Q. You—you can't say that any—that four days would have made a difference whatsoever with regard to this patient, am I correct, sir?

A. I—I cannot, no. I've had patients that have had this injury that w[ere] treated immediately and they're doing worse and I still think that that's a good outcome.

*Id.* at 87:16–23, 88:18–89:5, 95:3–96:1 (emphases added). As this excerpt makes plain, Dr. Godoy could *not* say whether the four-day delay in treatment—occasioned by Dr. Lee's misdiagnosis—caused Mrs. Breaux *any* damage.[12] *No* evidence (it goes without saying) isn't enough to withstand summary judgment. *See Rojas v. Carnival Corp.*, 2015 WL 7736475, at *7 (S.D. Fla. Nov. 30, 2015) (Lenard, J.) (granting the defendant's summary-judgment motion in a cruise-ship, negligent-medical-transport case because "the only evidence that addresse[d] [the plaintiff's] medical condition is his deposition" and

_____

[12] In discussing how successful the treatment was, Dr. Godoy did acknowledge that, to Mrs. Breaux, her limitations might *feel* significant. *See* Godoy Dep. Tr. at 88:5–14 ("A. Yeah, so it seems that—that she has full flexion and that she lacks five degrees of terminal extension. Q. Counsel asked this of you, that's a relatively minor limitation, would you agree with that, sir? A. I think you'd have to ask her how she feels about that one, but I would say that—I could give it to you quantitatively, it's five hundred and eightieth, you know, I don't know."). But that's irrelevant to our analysis. Mrs. Breaux's *subjective* feelings of pain cannot substitute for the kinds of evidence she needs at summary judgment—evidence that would link her injuries to Dr. Lee's misdiagnosis rather than to the fall. *Cf. Harrell*, 2022 WL 898565, at *20 ("[A]t summary judgment, a plaintiff must produce *evidence* to support her contention[s.]"); *Versfelt v. Sanza Food Serv.*, 2022 WL 479881, at *12, *17 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (granting summary judgment for the defendant in an employment-discrimination case because the plaintiff "presented no direct evidence of discrimination" and because "none of the evidence [the plaintiff] cite[d] support[ed] [his] claim").

because "there [was] no evidence in the summary judgment record linking the delay caused by [the cruise line] to any injury or exacerbation of injury suffered by [the plaintiff]").

The truth, though, is that—again, fairly read—Dr. Godoy's testimony actually supports Norwegian's view that Mrs. Breaux's injuries were (most likely) caused by her fall, not by Dr. Lee. *See* Godoy Dep. Tr. at 62:6–15 ("I would say it's overwhelmingly more likely that . . . all of these injuries occurred at the same time from her—from—from an injury. I don't—I think it would be—I think it would be unlikely that she would have—I think that was caused the most—the majority of her injuries is when she had the—the—largest injury to her elbow, you know."); *see also id.* at 95:3–19 ("Q. And the type of injury that you've see that is consistent with somebody that had a fall like Mrs. Breaux did or did at the time; is that right? A. Yes. Q. . . . You cannot testify with any degree of certainty that any delay in treatment of Mrs. Breaux would have changed the outcome she ultimately had; is that right? A. . . . I can't say that—I mean, like you mentioned I think she had an excellent outcome from her injury regardless of that delay, you know."). Unsurprisingly, courts in our District have entered judgment for the cruise line in similar circumstances. *See, e.g.*, *Kellner*, 2016 WL 4440510, at *2 n.1 (granting cruise line's motion for directed verdict because, among other things, the plaintiff's expert— if allowed to testify—"would have merely offered the opinion that [the] [p]laintiff sustained an injury to her Achilles tendon during the slip and fall event" but would "not [have] provided the causal link between any medical care needed by [the] [p]laintiff or medical expenses incurred by [the] [p]laintiff as a result of the incident"), *aff'd*, 753 F. App'x 662 (11th Cir. 2018).[13]

---

[13] And we don't make much of Dr. Godoy's generalized observation that a delay in treatment *could*— in *other* cases—lead to worse outcomes, *see id.* at 95:15–16 ("[D]elay *in general* is associated with poor outcomes[.]" (emphasis added)), because he was clear that this didn't happen to Mrs. Breaux, *see, e.g.*, *id.* at 63:21–64:12 (noting that, sometimes, "having an unstable joint . . *can* cause trauma to the joint surface and that *can* lead, down the road, . . . .to arthritis and post-traumatic arthritis," but adding that, "in reviewing the operative report[,] I don't see anything, any place where it's mentioned that the joint surface itself" was damaged in Mrs. Breaux's case (emphases added)).

Dr. Richards was no more helpful. His notes show only (1) that he saw Mrs. Breaux, *see* Primary Care Physician's Records at 6; (2) that she "continued to have worsening pain involving her left forearm," *id.*; and (3) that he suspected a "possible fracture," *id.* at 9. Dr. Richards also noted a "[c]oncern [that the] splint [was] not [ ] most appropriately fitted[.]" *Id.* at 9.[14] Dr. Richards then referred Mrs. Breaux to the Bone & Joint Clinic. *Id.* (citing an "Ambulatory Referral to Orthopedic Surgery"). That's it. That's all Dr. Richards's records show.

Grasping at straws, Mrs. Breaux points to our decision in *Torres v. Walmart*, 555 F. Supp. 3d 1276, 1289–98 (S.D. Fla. 2021) (Altman, J.), as support for her causation contentions, *see* Response at 19–20. But *Torres* cannot save her here. In *Torres*, we held that a slip-and-fall plaintiff's treating physician could "offer expert opinion on the question of causation, regardless of when his opinions were formed," because there was "no indication that [the plaintiff] (or his legal team) retained [the physician] to provide testimony in the case." *Torres*, 555 F. Supp. 3d at 1297 (emphases omitted). The physician in *Torres* had "examined, treated, and advised [the plaintiff]—and later performed surgery" on him. *Id.* at 1296. Our holding was based, in part, on our recognition that "[t]reating physicians . . . commonly consider the cause of any medical condition presented in a patient." *Id.* at 1298 (cleaned up). From this, Mrs. Breaux deduces that she should be permitted to rely on Dr. Richards's causation opinions. *See* Response at 19 ("The Defendant argues that Dr. Richards is prohibited from offering his causation opinion, as it relates to the Plaintiff's injuries, because he did not provide extensive

---

[14] When it comes to Dr. Richards, Mrs. Breaux makes much of very little. She assumes that Dr. Richards's comment about the splint means that the "shipboard treatment, of having [Mrs. Breaux's] arm secured in a splint, was not appropriately fitted for the type of injury sustained." Response at 18. But that's not what he said. He didn't say that giving Mrs. Breaux a splint was the wrong treatment for this particular injury. He said only that her splint *may* not have been appropriately fitted given the injury she sustained. Here's the thing, though: Even if Dr. Richards *had* said what Mrs. Breaux now thinks he said, we're not sure that would've made the least bit of difference. Dr. Richards, after all, never testified—and never implied—that the ill-fitting splint *caused* Mrs. Breaux any injury. And that's really the only question that matters.

treatment. This is not so."). But Mrs. Breaux's problem isn't so much that Dr. Richards is a treating physician—the issue in *Torres*. Her problem is that Dr. Richards offered no causation opinions at all. And that's really the end of that. *See A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1342 (S.D. Fla. 2021) (Altman, J.) ("[At summary judgment] [t]he non-movant . . . must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *22–24 (S.D. Fla. Feb. 8, 2021) (Altman, J.) (discussing the Eleventh Circuit's definition of "a scintilla of evidence" and granting summary judgment because the non-movant "failed to meet that standard").

Against all this, Mrs. Breaux advances two arguments—both unpersuasive.

*First*, she says that "[t]he causal link between having a bone out of joint and the pain it causes is . . . readily apparent to any lay person." Response at 15. Here, again, Mrs. Breaux misses the point. We don't deny that any lay person could trace the pain in her arm to an earlier slip-and-fall. The question we face here, though, is whether a lay person can link some portion of that pain, *not* to the fall, but to the doctor's subsequent misdiagnosis—a misdiagnosis that, according to Mrs. Breaux's own doctor, didn't seem to exacerbate her injuries at all. We don't think she can.

At one point (it's true), Mrs. Breaux *seems* to suggest that she's also seeking compensation for the pain she suffered during those few days between Dr. Lee's misdiagnosis and her visit to Dr. Richards. *See* Complaint ¶¶ 12 ("[Mrs. Breaux] continued to experience severe pain for the duration of the [c]ruise."), 20 ("That as a further result of the Defendant's negligence, the Plaintiff suffered bodily injury and resulting pain & suffering, mental anguish, medical expenses and loss of enjoyment of life."); *see also* Response at 15 ("It is abundantly clear, the pain and suffering the Plaintiff unreasonably endured, for the remainder of her stay on the ship, is an element of damage causally connected to Dr. Lee's misdiagnosis of [Mrs. Breaux]."). But, to succeed on this claim, she would've had to show, *with evidence*, that some portion of her pain was caused by *the misdiagnosis*—rather than the

fall. To do that, of course, she would've needed to prove *either* that (1) the cruise ship could've carried out, in those few days, the surgery Dr. Godoy later performed, *or* that (2) she would've gotten off the ship (had she known the true diagnosis) and undergone the surgery in some foreign port during those days. Mrs. Breaux has adduced no evidence for either proposition. She never claims that the *Breakaway*'s doctors could've performed her surgery—even if they'd wanted to. *See generally* Response at 4–6 (arguing about the standard of care at sea without ever suggesting that cruise ships have the capacity to perform a surgery like the one she needed). And she's conceded that she wouldn't have been willing to see a doctor in Mexico—which is where the *Breakaway* was docked when she fell. *See* Breaux Dep. Tr. at 210:9–17 ("A. Would I have left the ship if I knew it was broke? Q. That's correct. A. And out of joint? Q. That's correct. A. To get it fixed? As long as it wasn't in Mexico, I would have. I don't trust them doctors. I'm sorry. I'm telling you.").[15]

It's admittedly possible to conceive of some hypothetical scenario in which the *Breakaway* visited some *other* country on its way back to New Orleans—perhaps even a country whose doctors Mrs. Breaux might've trusted with her surgery (though a quick glance at a map reveals that there really are no countries between Cozumel and Louisiana). But, alas, Mrs. Breaux has failed to offer any evidence that the *Breakaway* visited any country other than Mexico after her fall—and, as we've established, her testimony was clear that she was unwilling to have her surgery in Mexico. In short, on our facts, there doesn't seem to have been much anyone could've done for Mrs. Breaux between her fall and her eventual return to New Orleans—a reality that further supports Norwegian's view that the misdiagnosis *wasn't* the cause of Mrs. Breaux's few extra days of pain.

*Second*, she insists that, "[b]ut for Dr. Lee's misdiagnosis of [her] injuries, [she] would have made a full recovery and would not be experiencing the physical limitations she experiences today."

---

[15] There's also no evidence that Mrs. Breaux could (or would) have taken some form of medical transport—a helicopter, say—off the ship to another port.

Response at 18. As we've seen, however, she has no evidence of this. And the evidence she does have—from Dr. Godoy—fully supports Norwegian's position that, in all likelihood, her injuries were caused by the fall, not the misdiagnosis. *See generally* Godoy Dep. Tr. at 62:6–15, 87:16–23, 88:18–89:5, 95:3–96:1. Indeed, Dr. Godoy was clear that "she had an excellent outcome from her injury regardless of delay," *id.* at 95:17–19, and that "I've had patients that have had this injury that w[ere] treated immediately and they're doing worse [than Mrs. Breaux] and I still think that that's a good outcome [for them]," *id.* at 95:23–96:1. This devastating testimony reads as though it might have come from Norwegian's expert. But it didn't. It came from Mrs. Breaux's. And it sinks her case.

We thus **GRANT** Norwegian's motion for summary judgment on Counts I and II.

## II.     Negligent Hiring, Retention, and Training

Mrs. Breaux also asserts derivative claims against Norwegian for negligent hiring, retention, and training. *See* Complaint at 6–7. But she cannot prevail on these because she's failed to show some underlying tortious conduct.[16] *See, e.g., Dewit v. UPS Ground Freight, Inc.*, 2017 WL 2903347, at *3 (N.D. Fla. June 16, 2017) (Walker, J.) ("UPS Freight argues that it is entitled to summary judgment on [the] Plaintiffs' derivative-liability claims because they are improper concurrent theories of liability. . . . [T]he derivative-liability claims provide nothing more than that which is already provided in the underlying negligence claim against the driver."); *Schutt v. Lewis*, 2014 WL 3908187, at *6 (M.D. Fla. Aug. 11, 2014) ("[The] Plaintiffs' negligent training and negligent supervision claims require a showing of some underlying tortious conduct committed by an employee. As [the Defendant's] underlying conduct was not tortious, the City is entitled to summary judgment on the negligent training and supervision claims

---

[16] Mrs. Breaux rightly concedes that her derivative claim against Norwegian turns on the viability of her underlying medical-negligence claim. *See* Response at 20 ("[The] Plaintiff['s] claims for negligent hiring, retention[,] and negligent training hinge on a finding that Dr. Lee deviated from the standard of care and the Plaintiff's injuries occurred as a result thereof.").

as well."). Since Mrs. Breaux has adduced no further evidence in support of this derivative claim,[17] we

**GRANT** Norwegian's motion for summary judgment on Count III.[18]

***

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 94] is **GRANTED**.

2. Pursuant to FED. R. CIV. P. 58, we'll enter final judgment separately.

3. The Clerk of Court shall **CLOSE** this case.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELLED**.

**DONE AND ORDERED** in Miami, Florida, this 24th day of June 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[17] Rather than provide some additional evidence for this claim, Mrs. Breaux says only that her "claims for negligent hiring, retention[,] and negligent training hinge on a finding that Dr. Lee deviated from the standard of care and the Plaintiff's injuries occurred as a result thereof." Response at 20.
[18] The Complaint originally referred to two separate counts as "Count III[.]" Complaint at 6 ("Count III: Negligent Hiring, Retention and Training Policy by NCL"), 7 ("Count III: Loss of Consortium by Deprived Spouse Stephan Breaux"). Since we've already dismissed the second of these, *see* Order Granting Motion to Dismiss the Loss of Consortium Claim [ECF No. 30], we (in this Order) refer only to the first Count III.